Hart HASTINGS and Teri Laster,
Plaintiffs/Appellees,

v.

SOUTH CENTRAL HUMAN RESOURCE
AGENCY, Defendant/Appellant.

Court of Appeals of Tennessee,
Western Section, at Nashville.

Sept. 18, 1991.

Application for Permission to Appeal
Denied by Supreme Court,
March 9, 1992.

Charles R. Ray, Paul T. Housh, Ray &
Housch, Nashville, for plaintiffs/appellees.

Clinton H. Swafford, Swafford, Peters &
O'Neal, Winchester, for defendant/appel-
lant.

FARMER, Judge.

This is an appeal from the trial court's
finding that the South Central Resource
Agency acted illegally, arbitrarily and ca-
priciously, and the Chancellor's order for
the agency to reinstate the plaintiffs to
their former positions with back pay, se-
niority and other emoluments of the office.

South Central Human Resource Agency
("SCHRA") is located in Lincoln County,
Tennessee and provides human resource
services for 12 or 13 surrounding counties.
On July 24, 1987, SCHRA entered into a
contract with Columbia State Community
College under the Job Training Partnership
Act 3% Older Workers Program SDA–II.
The primary purpose of the said contract

was to contact and train older individuals and place them in positions of employment. Hart Hastings, an employee of SCHRA, was designated as program director and charged with the responsibility of supervising the other employees in the performance of their duties required under the provisions of the contract. Teri Laster was the secretary assigned to assist Hart Hastings in carrying out the responsibilities of SCHRA under the contract. Paul Thompson, Mary Ring and Dot Edwards were designated by SCHRA as job developers to work under the same contract. The term of the contract was from July 1, 1987 to October 31, 1988.

In July of 1987, SCHRA submitted a billing for services rendered under the contract to the Columbia State Community College representative. The executive director of the college detected irregularities in the records submitted. The college made personal contacts with some of the participants in the program for which the billings were submitted and it was allegedly learned that none of the participants had received the training required by the contract. Thereafter, the college wrote a letter to SCHRA challenging its performance under the contract.

Upon learning of these deficiencies, SCHRA immediately ordered an internal examination of the program. This examination allegedly revealed that none of the participants of the program had received the amount of training required under the terms of the contract. The records prepared by the staff of Hart Hastings reflected the required training had been given. Ultimately, the college terminated the contract and demanded a refund of all monies paid thereunder.

On January 25, 1988, the executive director of SCHRA immediately terminated plaintiff, Hart Hastings, without notice and prepared a letter to him indicating that the records on file contained erroneous forms that were considered fraudulent. Hart Hastings was informed that he could appear before the personnel committee to respond to his immediate termination. In addition, Teri Laster was also terminated without notice for falsification of time and attendance records and she was also informed that she was entitled to a meeting before the personnel committee. A personnel committee meeting was held on January 26, 1988 wherein the committee ratified the executive director's actions, thereby immediately terminating the plaintiffs Hart Hastings and Teri Laster. The matter was referred to the Grievance Committee to conduct a hearing. Thereafter, the plaintiffs filed their grievances and a grievance meeting was held on July 11, 1988. At this hearing all parties were represented by attorneys. After a hearing was conducted, the plaintiffs and other interested persons were asked to leave the room for closed deliberations. No minutes were made at the closed deliberations. On July 12, 1988, the Grievance Committee filed its memorandum of action recommendation. The memorandum confirmed the immediate dismissal and termination of Hart Hastings and modified the termination of Teri Laster. Teri Laster's termination was modified in that she was given the opportunity to come back to work at a comparable position and salary pursuant to a six-month probationary period and no back pay. Teri Laster declined to accept the position tendered to her.

On September 2, 1988, the plaintiffs filed a writ of certiorari pursuant to T.C.A. § 27–9–101, et seq., or in the alternative for judicial review pursuant to T.C.A. § 4–5–101, et seq. The trial court found that:

1. SCHRA is a state agency;

2. Petitioners were summarily discharged by the Executive Director of the SCHRA without prior notice and without an opportunity to be heard before Mr. Tipps emphatically stated that their discharge was final.

3. The agency adopted a Personnel Policy and Procedure Manual for the benefit of the agency and the employees. Therefore, in an employee matter the agency must follow its manual. It failed to do so.

4. The only time an employee could be discharged summarily without prior notice was under paragraph V, sub-para-

graph 5. Misconduct. Yet this paragraph was used to summarily discharge these two petitioners.

5. None of the evidence presented justified a proceeding under the term misconduct. Therefore, misconduct could not be used.

6. The hearing before the Personnel Committee, Exhibit 11, was a sham. A cursory reading of this proceeding is repulsive. If proper notice of the hearing and a proper charge is to be given any consideration the Executive Director of the agency ramroded [sic] the entire proceeding and dictated the results in the face of a request by Mr. Hastings for time to respond to being summarily fired. The Personnel Committee in its entirety is revolting.

7. The hearing before the Grievance Committee was closed contrary to the law of the State of Tennessee which causes that hearing and the results thereof to be a nullity.

8. The employees who made the errors or the incorrect entries are not before the Court.

This Court's review in this proceeding is limited to the proposition as to whether or not the Executive Director and the Grievance Committee exceeded their respective jurisdiction or acted illegally, arbitrarily, or capriciously. Based upon the findings set forth above the hearing before the Grievance Committee could not be closed and was, the policies set forth in the Personnel and Procedure Manual should have been followed and were not and the balance of the evidence analyzed by the Court indicates arbitrariness and capriciousness without question in this court's mind. Therefore, this Court holds that the action against the Petitioners was illegal, arbitrary and capricious.

While Courts are reluctant to substitute judgment for that of an administrative body, it is necessary in order to afford relief to order reinstatement of petitioners to their former positions with back pay, seniority and other emoluments of the office.

An application has been made for attorney's fees for counsel for the petitioners but no citation of authority has been furnished the Court. Certainly the counsel for petitioners have earned an attorney fee and if the Court had any authority to grant a fee against the defendant it would. However, the Court holds that generally in Tennessee cases the parties must bear the expense of their counsel except when statutorily allowed.

It is from this judgment that SCHRA now appeals. The issues as set forth by the appellant are: [1]

I. Is the South Central Human Resource Agency a state agency and thus subject to judicial review pursuant to T.C.A. § 27–7–101, et seq., or T.C.A. § 4–5–102, et seq.?

II. Did the hearing before the Grievance Committee violate the "Tennessee Open Meeting Act" sometimes referred to as the "Sunshine Law"?

III. Did the Grievance Committee extend its jurisdiction or act illegally, fraudulently, arbitrarily or capriciously?

IV. Did the trial court err in its failure to construe the various sections of the personnel policies and procedures manual in pari materia to determine the legality of the termination of the plaintiffs?

I.

*"State Agency"*

■ SCHRA contends that the trial court erred in holding that it was a "state agency" subject to judicial review. In support of its position SCHRA has cited an opinion of the Tennessee Attorney General that the Upper Cumberland Human Resource Agency was not an instrumentality of the state. Op.Tenn. Att'y Gen. (June 22, 1977). Since the Upper Cumberland Human Resource Agency is not presently before us and the Tennessee Attorney General memo is merely persuasive, we will not belabor the issue by analyzing it. We do

1. Any issues not specifically addressed herein are pretermitted by the issues determined.

feel, however, that the analysis utilized in the Tennessee Attorney memo serves as helpful guidance in the present case. Although refined somewhat, the factors as set forth by the Attorney General which should be examined in determining whether an entity or agency is an instrumentality of the state are as follows:

1. Whether the enabling statute exhibits a legislative intent to regard the entity as a state agency.

2. Whether the State or political subdivision thereof is directly involved in the operation, supervision and control of the entity.

3. "Whether the entity serves as a conduit through which the State acts ... to carry out...." a public or governmental function.

4. Whether the state appropriates funds to the entity.

SCHRA was duly created and authorized under the Human Resource Agency Act of 1973 ("Act"), T.C.A. § 13-26-101, *et seq.,* which provides in pertinent part:

13-26-102. Creation authorized.—The chief elected public officials of various counties and/or cities of the economic development districts established under chapter 14 of title 13 shall be empowered to create a human resource agency. It is the intent of this chapter that there may be four (4) metropolitan human resource agencies (Memphis–Shelby, Nashville–Davidson, Knoxville–Knox, Chattanooga–Hamilton) and no more than nine (9) rural human resource agencies, coterminous with the boundary lines of the development districts. It is the further intent of this chapter that the agencies so created may be the delivery system for human resources, and in no way an infringement on the planning functions of the development districts.

T.C.A. § 13-26-102. The Act does not expressly provide whether or not human resource agencies are regarded as state agencies. We do feel, however, that the legislative intent implicit in the Act is that they should be regarded as such.

As evidence of the State's intention to monitor, supervise and control human resource agencies, the Act mandates that a human resource agency establish a governing board and policy council. T.C.A. §§ 13-26-102 and 13-26-103.[2] The Act

---

2.    13-26-103. Governing board—Policy council—Establishment.—(a) There shall be established a governing board, the membership of which shall consist of the county executive of each county within the district, the mayor of each municipality within the district, the chief executive officer of any metropolitan government within the district, one (1) representative from a local agency in each county knowledgeable of and dealing with the problems concerning human resource agencies appointed by the county executive or chairman, and one (1) state senator and one (1) state representative whose senatorial or representative districts lie wholly or in part within the development district. The senate member shall be selected by the senators whose districts are wholly or in part within the development district and the representative member shall be selected by the representatives whose districts are wholly or in part within the development district. Senators and representatives shall serve on such boards for two (2) years or until they leave the general assembly, whichever occurs first. Senators whose districts lie wholly or partly within the development district shall meet at the call of the senior senator among those affected, for the purpose of selecting a member of the governing board, and representatives shall meet at the call of their senior representative for that purpose. Membership on such boards shall be for four (4) years or until the expiration of the term of the official by whom such representative was appointed, whichever occurs first. Members are subject to reappointment. The representative of each county and city government as indicated above may be chosen from an existing city or county planning commission. The board may appoint an executive committee to act for it and determine the authority of such committee. No member of the general assembly shall receive any additional compensation for his service on a board.

(b) No votes may be cast by proxy. Only duly appointed members of the board may vote.

(c) If a member of a board created under the provisions of this chapter participates in a vote of such board after his term of office has expired, no state funds shall be released to or expended by such board until such time as the board meets and rescinds any votes in which such member has participated and reconsiders its action with a lawfully constituted board.

(d) This board shall appoint a policy council to act for it and shall determine the authority of such counsel over and above that specified in § 13-26-104. The membership of the

sets forth the powers to which the agency is entitled. T.C.A. §§ 13–26–104, 13–26–105 and 13–26–108. Specifically, the powers enumerated pursuant to the Act are:

**13–26–104. Policy council—Powers.**—The powers of every policy council shall include the power to adopt bylaws, to appoint persons to senior staff positions, to determine major personnel, fiscal, and program policies, to approve overall program plans and priorities, and to assure compliance with conditions of and approve proposals for financial assistance under this chapter subject to ratification by the governing board.

T.C.A. § 13–26–104.

In addition to the foregoing, SCHRA is also required to prepare yearly reports of its activities, including its financial status, and submit a copy of this report to the Governor, General Assembly and Commissioner of Finance and Administration. T.C.A. § 13–26–106. SCHRA is also subject to an annual audit by the State Treasurer Comptroller. T.C.A. § 13–26–106(b)(1). Any funds which the state appropriates to implement the provisions of the Act are subject to approval by the Governor and Commissioner of Finance and Administration. The approval of these funds can only be given after the office of the Governor reviews the annual work program developed by SCHRA. The annual work program is to be in accordance with the development plans of the state. T.C.A. § 13–26–107. The governing board of SCHRA is required to adopt statewide uniform travel regulations which are subject to the approval of the Commissioner of Finance and Administration. T.C.A. § 13–26–108(1). SCHRA is required to reimburse its officers and employees for official travel in conformance with this regulation. Id. The governing board is also required to develop a competitive bidding system on all purchases of supplies and equipment and other contracts. This system of competitive bidding is required to be in the form of written procedure and submitted to the State Board of Standards for approval.

T.C.A. § 13–26–108(2). The governing board is also required to develop written personnel procedures for the hiring, dismissal, promotion and demotion of employees. These personnel procedures are required to include an employee compensation plan which takes into account "state salary schedules, local government statutory schedule and regional private market variations." T.C.A. § 13–26–108(3). These written personnel procedures are filed with the Commissioner of Finance and Administration.

It is apparent from the provisions of this Act itself, that human resource agencies promulgated thereunder are not left to their own devices, but instead are controlled and monitored by the state. Although SCHRA argues that the policy council, which consists of "providers and consumers of human resource services" T.C.A. § 13–26–103(d), actually supervises and controls the agency and the state is not, therefore, involved in the operation, supervision and control of the entity, we fail to see the merit in this argument. The "policy council" is merely acting on behalf of or for the "governing board," *see* T.C.A. § 13–26–103, and pursuant to the powers enumerated to it. The governing body of this agency is comprised of "elected officials." Specifically, the governing body is comprised of

[T]he county executive of each county within the district, the mayor of each municipality within the district, the chief executive officer of any metropolitan government within the district, one (1) representative from a local agency in each county knowledgeable of and dealing with the problems concerning human resource agencies appointed by the county executive or chairman, and one (1) state senator and one (1) state representative whose senatorial or representative districts lie wholly or in part within the development district.

T.C.A. § 13–26–103(a).

As far as funding is concerned, SCHRA is funded with both private and public

policy council shall be broadly based and equitably distributed between providers and

consumers of human resource services and/or established by public law. (insert # 3)

funds. One source of these funds is the State of Tennessee. It was clearly the Legislature's intent for "the state to assist financially with the delivery of human resources for residents." T.C.A. § 13–26–107(c). In fact, the state is authorized as follows:

**13–26–107. Appropriations—Local contributions.**—(a) Any funds appropriated to implement the provisions of this chapter are subject to the approval of the governor and the commissioner of finance and administration.

(b) Such approval shall be given only after review by the office of the governor of the annual work program developed by the human resource agency to assure that such program is in accordance with the development plans of the state.

(c) It is the intent of the state to assist financially with the delivery of human resources for residents. After the creation of any such board as provided in this chapter and when the local governments have indicated a willingness to contribute financially by adopting a budget requiring a certain per capita assessment, the state shall be authorized, contingent on funds being specifically allocated by the state for this purpose in the annual appropriations act, to match the local contributions according to the following schedule:

| Local Assessment Cents/Capita | Annual State Contribution | Contribution Cap/County |
|---|---|---|
| 1–5 | $ 30,000 | $ 7,500 |
| 6–10 | $ 60,000 | $ 7,500 |
| 11–15 | $ 90,000 | $10,000 |

(d) Such local contributions shall be based upon, in the case of counties, an amount not to exceed fifteen cents (15¢) per capita based on the latest decennial census, one half (½) of which may be contributed by local incorporated cities or by other private, public or semipublic bodies; provided, however, that no county shall be required to contribute more than ten thousand dollars ($10,000) annually. The aggregate of such funds may also be used for purposes of matching various federal programs of assistance. Counties and municipalities may participate independently of each other in financing the activities of the board. Cities and counties are specifically authorized to appropriate and expend funds for carrying out the purposes of this chapter.

Insofar as the agency's purpose, the agency is a nonprofit organization and primarily promotes the public welfare by providing human resource services. Pursuant to its bylaws SCHRA has explicitly stated that its purpose is:

ARTICLE II PURPOSE

The purpose of the Agency shall be to promote the development of human resources in the South Central Tennessee region through the effective and efficient delivery of human services. It is recognized that a special need exists to obtain strong local involvement in the decisions of Federal, state and other agencies which affect the welfare and well-being of the region's citizens. The Agency shall have the responsibility to provide both a forum and a vehicle for local authority to administer and to assure the operation of human resource programs; to receive and disburse funds appropriated under the Human Resource Act of 1973 and the Community Services Block Grant; to receive and disburse funds and contributions from local public and private sources; and to receive and disburse funds under any Federal, state of private assistance program in which the Agency could serve as a grantee, subgrantee, contractor, or sponsor for projects deemed appropriate for inclusion in human resource programs.

It is apparent from the purpose and function of this agency that it is merely a conduit through which the state serves the public. Not only is the agency a conduit through which the state acts, but the agency itself holds itself to be a state agency. SCHRA has vehicles which have the Tennessee state seal and other official insignias on them. These vehicles have State of Tennessee government license plates and are operated with state gas. SCHRA's employees carry badges which state that SCHRA was "established under state law."

In addition, SCHRA provides seemingly governmental functions in that it provides low income assistance programs, block grant programs, weatherization programs, prenatal programs, SDA–10 programs for the young and elderly, SDA–11 programs for the young and elderly, and the three percent programs for older workers.

For the foregoing reasons we are of the opinion that SCHRA is an agency of the State of Tennessee.

## II.

### *Sunshine Law*

■■■ The trial court found that the closure of the Grievance Committee hearing was in contravention of T.C.A. § 8–44–101, *et seq.* and, therefore, the proceeding was null and void.

The Tennessee Open Meetings Act, commonly referred to as the Sunshine Law, is set forth in T.C.A. § 8–44–101, *et seq.* The purpose of the Open Meetings Act is to declare "it to be the policy of this state that the formation of public policy and decisions is public business and shall not be conducted in secret." T.C.A. § 8–44–101(a). Specifically, the Open Meetings Act requires that:

**8–44–102. Open meetings—"Governing body" defined—"Meeting" defined.**—(a) All meetings of any governing body are declared to be public meetings open to the public at all times, except as provided by the Tennessee Constitution.

(b)(1) "Governing body" means the members of any public body which consists of two (2) or more members, with the authority to make decisions for or recommendations to a public body on policy or administration and also means a community action agency which administers community action programs under the provisions of 42 U.S.C. § 2790. Any governing body so defined by this section shall remain so defined, notwithstanding the fact that such governing body may have designated itself as a negotiation committee for collective bargaining purposes, and strategy sessions of a governing body under such circumstances shall be open to the public at all times.

(2) "Governing body" also means the board of directors of any nonprofit corporation which contracts with a state agency to receive community grant funds in consideration for rendering specified services to the public, provided community grant funds comprise at least thirty percent (30%) of the total annual income of such corporation. Except such meetings of the board of directors of such nonprofit corporation that are called solely to discuss matters involving confidential doctor-patient relationships, personnel matters or matters required to be kept confidential by federal or state law or by federal or state regulation shall not be covered under the provisions of this chapter, and no matter shall be discussed at such meetings.

(3) "Governing body" also means the board of directors of any not-for-profit corporation authorized by the laws of Tennessee to· act for the benefit or on behalf of any one (1) or more of counties, cities, towns and local governments pursuant to the provisions of title 7, chapters 54 or 58. The provisions of this subdivision shall not apply to any county with a metropolitan form of government and having a population of four hundred thousand (400,000) or more according to the 1980 federal census or any subsequent federal census.

(c) "Meeting" means the convening of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter. Meeting does not include any on-site inspection of any project or program.

(d) Nothing in this section shall be construed as to require a chance meeting of two (2) or more members of a public body to be considered a public meeting. No such chance meetings, informal assemblages, or electronic communication shall be used to decide or deliberate public business in circumvention of the spirit or requirements of this part.

T.C.A. § 8–44–102. Clearly by its own terms this statute applies to meetings of

"governing bodies." As set forth in T.C.A. § 8–44–102 " '[g]overning body' means the members of any public body ... with the authority to make decisions for or recommendations to a public body on policy or administration...." T.C.A. § 8–44–102(b)(1). While we are aware that a public body includes "any board, commission, committee, agency, authority or any other body, by whatever name, whose origin and authority may be traced to State, City or County legislative action....", *Dorrier v. Dark,* 537 S.W.2d 888,892 reh'g denied, 540 S.W.2d 658 (Tenn.1976), in order to determine whether the Grievance Committee was a "governing body" within the purview of the Sunshine Law, we need to look at the organizational structure of SCHRA and the function of the Grievance Committee within this structure.

In *Fain v. Faculty of the College of Law of the University of Tennessee,* 552 S.W.2d 752 (Tenn.Ct.App.1977), this Court held that a faculty committee appointed and presided over by the Dean of the College of Law was not a "governing body" within the meaning of the Sunshine Law. In making this determination, the court noted that, while the Dean had administrative responsibility for the functions of the College of Law, neither the Dean nor the faculty had the authority to formulate or recommend policies governing the college. Only the board of trustees possessed that authority.

Under T.C.A. § 13–26–108(3) and the by-laws of the South Central Human Resource Agency, the agency's governing board is charged with developing "written personnel procedures ... for the hiring, promotion, demotion and dismissal of all employees...." T.C.A. § 13–26–103(d) directs the board to appoint a policy council, whose powers, enumerated in T.C.A. § 13–26–104, include appointing senior staff members and determining "major personnel, fiscal, and program policies...." Under the bylaws, the chairman of the policy council is directed to appoint a Grievance Committee. The sole function of the committee is to hear and dispose of personnel complaints in accordance with the policies and procedures formulated by the governing board. Although the Grievance Committee's actions are subject to review and ratification by the policy council, the Grievance Committee does not make decisions for or recommendations to the governing board on matters of policy or administration. The Grievance Committee is merely responsible for following the policy and procedures as dictated by the board. In accordance with the personnel procedures, the committee then makes recommendations to the executive director of the agency. The director, who oversees daily administration of agency programs and personnel matters, is not a member of the policy council or governing board.

In sum, it does not appear that the Grievance Committee is in a position to formulate the public policy and decisions referred to in the Sunshine Law's purpose, and we fail to see how the committee can be viewed as a "governing body."

## III.

### Review of the Agency's Decision

■ Having found that the proceeding before the Grievance Committee did not violate the Sunshine Law, we next must determine whether the trial court erred in holding that the Grievance Committee acted fraudulently, illegally or arbitrarily. *Yokley v. State,* 632 S.W.2d 123 (Tenn.Ct. App.1981); *Hoover Motor Express Co. v. Railroad & Pub. Util. Comm'n,* 195 Tenn. 593, 261 S.W.2d 233 (1953). The basis for this holding was that the appellees were summarily discharged without prior notice or an opportunity to be heard in violation of the agency's personnel policies and procedures manual.

Specifically, the Chancellor found that under the manual, the agency could not terminate the employees without prior notice unless the reason for such termination was misconduct. The Chancellor further found that the stated bases for the terminations, falsification of record on the part of Ms. Laster and improper program management on the part of Mr. Hastings, did not constitute misconduct.

Section V of the Personnel Polices and Procedures Manual provides the following:

*Termination of Employment*

The end of an employment relationship with the Agency will fall within one of the following categories, with indicated policies applicable to each:

. . . .

4. *Unsatisfactory Performance*—failure of an employee to meet performance standards, complete tasks in a timely, competent way, or maintain an adequate attendance record. Prior to termination for unsatisfactory performance, the immediate supervisor, program director, and the Executive Director must make a reasonable effort to resolve the problem with the employee. Written notification may be given by the Executive Director, or designee, that continued employment is in jeopardy and be told what must be done to improve the situation. With this notice, the person may be placed on a two month probationary status. If performance is not satisfactory at the end of this period, termination notice will be given. The Executive Director may extend this two month probationary period by one month if circumstances warrant. Uncooperative behavior or negative attitude which affect the program involved, work or morale or others at the Agency may result in this probationary period being shortened, at the discretion of the Executive Director.

5. *Misconduct*—involving gross employee misbehavior on the job, refusal to do work reasonably expected, wrongful use or taking of Agency property, or conviction of a felony. Termination for misconduct requires no prior notice.

The Chancellor found that the agency violated the manual by not proceeding under paragraph 4, entitled *"Unsatisfactory Performance,"* which requires written notice of the problem and a probationary period in which the employee attempts to correct the problem.

SCHRA, on the other hand, directs our attention to an earlier section of the manual, section IV, entitled *"Employee Conduct."* Under the paragraph entitled *"Other Activities,"* the manual states the following fifteen grounds for immediate dismissal depending upon the severity of the offense:

1. Each employee is expected to dress in a manner that is in good taste and appropriate to the position and proper in respect to specific occasions.

2. Employee *falsification of records* and/or documents.

3. Repeated tardiness or unauthorized absence. Absence of three (3) days without notification.

4. Failure of an employee to report to work at the beginning of the work day; leaving prior to the end of their work day without permission from the supervisor.

5. Loafing and/or *carelessness on the job.*

6. Sleeping on the job.

7. Fighting, provoking a fight, or attempting bodily harm or injury on another employee or to any other individual.

8. Abuse of equipment or materials.

9. Unauthorized possession of firearms, explosive materials, or other lethal materials on the Agency premises.

10. Possessing, drinking or being under the influence of intoxicants while on the job. Possession of or being under the influence of illegal drugs on the job.

11. Gambling on the job.

12. Soliciting, collecting money or circulating petitions at any time without the express permission of the Executive Director or designee.

13. Theft of Agency materials and/or equipment or use of same for personal benefit.

14. Insubordination or refusal of an employee to follow instructions or to perform designated work where

such instructions or work normally or properly may be required of an employee.

15. *Violations of other written policies, procedures or regulations.* (Emphases added)

SCHRA further contends that the Chancellor erred in not construing sections IV and V of the manual in *pari materia* to determine the meaning of misconduct.

After careful consideration, we find that the Grievance Committee did not act in a fraudulent, illegal or arbitrary manner when it upheld the appellees' terminations without prior written notice and a probationary period. Although improper program management and falsification of record may not be specifically enumerated under the paragraph entitled *"Misconduct,"* we agree that section V, along with the section entitled *"Employee Conduct,"* should have been construed together in determining what constituted misconduct and, therefore, grounds for immediate dismissal.

The Grievance Committee proceeded under section V of the manual and restricted its hearing to the determination of whether the appellees were terminated for misconduct as contemplated by that section. The Committee's decision to offer Ms. Laster a comparable position under a six-month probationary period with no back pay did not necessarily exonerate Ms. Laster of any wrongdoing, and we fail to see how such an offer made the Committee's initial decision to proceed under section V of the manual fraudulent, illegal, or arbitrary. Ms. Laster was terminated for falsification of record, and section IV of the manual defines this conduct as sufficient grounds for immediate dismissal.

As to Mr. Hastings, given the seriousness of the allegations as to his improper management of the 3% program, his apparent carelessness and failure to follow agency procedures, and the extent of the resulting harm to the agency, we cannot find that the Grievance Committee acted arbitrarily in determining that Mr. Hastings' actions constituted misconduct and in upholding his immediate termination.

The judgment of the trial court is reversed and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellees for which execution may issue if necessary.

CRAWFORD and CANTRELL, JJ., concur.